**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )
ESTATE OF                       )
ANTHONY PHILLIPS, *et al.*       )
                                )
        Plaintiffs,             )
                                )    Civil Action No. 00-1113
        v.                      )    (EGS)
                                )
DISTRICT OF COLUMBIA, *et al.*   )
                                )
        Defendants.             )
_____)


### MEMORANDUM OPINION

## I.    Introduction

On May 30, 1999, a fire claimed the lives of two
firefighters and seriously injured three others.  Plaintiffs in
the instant case, two of the injured firefighters and the estates
of the two firefighters who perished in the fire, bring suit
against the District of Columbia, the former Fire Chief and
Deputy Fire Chief of the fire department for alleged
constitutional violations and intentional torts giving rise to
injuries and loss of life.  On March 31, 2003, the Court denied
the defendants' motion to dismiss plaintiffs' claims brought
pursuant to 42 U.S.C. § 1983 against individual defendants and
the District of Columbia and plaintiffs' claims of intentional
torts against individual defendants in their personal

capacities.[1]

The defendants thereafter filed interlocutory appeals in the United States Court of Appeals for the District of Columbia Circuit, challenging this Court's March 31 Order denying their motion to dismiss on the issue of qualified immunity.  Following the defendants' notice of appeal but before the Circuit Court had resolved the defendants' motions, that court issued two opinions in cases unrelated to this case but bearing on the issue of qualified immunity for government officials.  Those cases are *International Action Center v. U.S.*, 365 F.3d 20 (D.C. Cir.), decided April 16, 2004, and *Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141 (D.C. Cir.), decided July 20, 2004.

On April 16, 2004 and July 22, 2004, this Court, *sua sponte*, ordered the parties to address the impact, if any, of the *Int'l Action* and *FOP* decisions, respectively, on the instant case. Both parties filed responses to *Int'l Action* and *FOP* pursuant to those orders.  Plaintiffs maintain that this Court's March 31, 2003 Order denying defendants' motion to dismiss their claims against the individual defendants accords with the *Int'l Action*

---

[1] *See Phillips v. District of Columbia, et al.*, 257 F. Supp. 2d 69 (D.D.C. 2003).  By the same Order, this Court granted the defendants' motion to dismiss plaintiffs' claims of conspiracy pursuant to 42 U.S.C. § 1985 and plaintiffs' claims of intentional torts against the District of Columbia and individual defendants in their official capacities.  Those claims are not addressed further in this Opinion.

and *FOP* decisions.  Defendants, on the other hand, argue that the Court of Appeals' decisions are supervening events requiring reconsideration of this Court's earlier decision and contend that the plaintiffs' claims against the individual defendants must be dismissed in light of those holdings.  Based on these arguments, this Court will construe the responses filed by the defendants as a motion to reconsider and vacate its March 31, 2003 Order denying defendants' motion to dismiss plaintiffs' claims against the individual defendants and the collateral claims against the District of Columbia.

On July 29, 2004, the Circuit Court ordered that the interlocutory appeal in this case be held in abeyance pending this Court's reconsideration of its qualified immunity decision. *See Phillips v. District of Columbia, et al.*, No. 03-7060 (D.C. Cir. July 29, 2004).

Having reconsidered its previous Opinion and Order in light of the Court of Appeal's decisions in *International Action Center* and *Fraternal Order of Police*, the parties' Court-ordered pleadings in response to those decisions, as well as the entire record in this case, the Court sees no reason to modify its original Order of March 31, 2003, denying defendants' motion to dismiss the § 1983 and intentional tort claims against them on

the grounds that they are immune.[2]  Thus, defendants' motion to
vacate this Court's Order of March 31, 2003 is **DENIED.**


## II.  Background

The following is a recapitulation of the facts and the
plaintiffs' claims, based on the Court's previous Memorandum
Opinion.


### A.  The Cherry Road Fire

On May 30, 1999, a fire broke out in a townhouse at 3146
Cherry Road, N.E., Washington, D.C.  The fire took the lives of
District of Columbia Fire Department ("DCFD") firefighters
Anthony Sean Phillips, Sr. and Louis J. Matthews.  Firefighter
Joseph Morgan suffered severe burns, and DCFD Lieutenant Charles
Redding was also burned in the fire.

Firefighter Phillips was assigned to DCFD Engine Co. 10, and
Matthews and Morgan were assigned to DCFD Engine Co. 26.  Redding
was an officer assigned to Engine Co. 26.  The firefighters were
responding to a multi-alarm fire on Cherry Road.

Firefighter Phillips entered the first floor of the

---

[2] On April 22, 2004, plaintiffs filed a stipulation dismissing
all claims against Defendant Cooper with prejudice.  On April 30,
2004, Plaintiff Redding filed a stipulation dismissing all claims
against Defendant Wilk with prejudice.  The Court approved both
dismissals by Minute Order on May 6, 2004.  Thus, today's
decision applies only to the claims against the remaining
individual defendants.

residence with his officer, Lieutenant Cooper, as did Matthews, Morgan and Redding.  After entering the building, Cooper was separated from Phillips.  Cooper exited the building and subsequently learned that Phillips had not.  When Redding entered the townhouse, he had been informed that the fire was on the first floor of the house.  As the firefighters were inside the house, a truck arrived on the scene and began ventilating the front of the townhouse.  A second truck then arrived and prepared to ventilate the basement.

While the firefighters were inside the house, the Incident Commander ("IC") twice radioed Redding to locate his position. However, Redding did not receive this transmission.  The IC had not established a fixed command post and was relying on a weaker portable radio device rather than the stronger radio mobile.  The firefighters inside the house were unaware of each other's presence.  Communications were impaired and visibility was poor. Redding did not even have a hand light with which to illuminate the inside of the townhouse.

The improper and untimely ventilation of the house resulted in a sudden increase in temperature.  Redding ran from the townhouse, with his face and back burning.  He relayed to the IC that Matthews was still in the townhouse.  Redding was unaware that Morgan and Phillips were also in the townhouse at that time. The IC did not order a rescue effort until approximately 90

seconds later, when firefighter Morgan exited the house critically injured.  Firefighter Phillips was found unconscious and severely burned, and was removed from the townhouse approximately seven minutes after the rescue effort began. Matthews was found unconscious and severely burned approximately eleven minutes after the rescue effort began.  Phillips died of his injuries approximately 23 minutes after his removal from the townhouse, while Matthews died of his injuries on the following day.

National Institute for Occupational Health and Safety ("NIOSH") investigators concluded that the DCFD did not follow standard operating procedures ("SOPs").  Specifically, the investigators found that there was a failure to properly ventilate the building and to coordinate personnel activities; that there was a failure to utilize the communication system effectively; and that there was a continuing failure surrounding the maintenance of self-contained breathing apparatuses as well as the need to provide all firefighters with automated personal alert safety systems.

The District of Columbia's Reconstruction Report mirrored the findings of NIOSH and restated criticisms articulated in a report published two years earlier.  The earlier report focused on the 1997 death of firefighter John Carter in a fire at a grocery store.  The Cherry Road report recognized that

deficiencies in training, staffing, equipment and administration, noted in the Carter report, persisted and stated that "[f]urther inaction on these recommendations cannot be tolerated."  The report concluded that "[t]he events that took place demonstrate the serious consequences that result from failure to train, equip, and staff appropriately."

Plaintiffs point to a number of deficiencies in the defendants' implementation of standard operating procedures, which they allege resulted in the death and injuries of the firefighters at Cherry Road.  Phillips' complaint, for example, alleges:

> "(a) the failure to follow appropriate equipment backup procedures (Engine No. 12, as fourth-due engine company, proceeded to the front of the structure and took position. By so doing, Engine No. 12 did not backup Engine No. 17, the second-due engine company, in the rear of the structure);
>
> "(b) the failure by an Officer-in-Charge (Defendant Cooper) to maintain required contact with a member of his crew, Firefighter Phillips, on the fireground;
>
> "(c) the failure by Defendant Cooper to immediately account for, report the fact of, and locate a missing firefighter (Firefighter Phillips);
>
> "(d) the failure by the D.C. Fire Department to have sufficient personnel on the scene to perform effectively;
>
> "(e) the failure to provide a size-up of the rear conditions (a size-up of rear conditions was never reported by Engine No. 17, the first arriving unit in the rear); and
>
> "(f) the failure to have an available backup unit in service to replace Truck No. 13 which delayed ventilation procedures."

Phillips Compl. at ¶ 27.

Plaintiffs claim that "[s]uch policy and custom not to implement recommendations to improve operation of the DCFD and enforce SOP's was the product of a conscious and deliberate decision and not simple or negligent oversight made under emergency, spur of the moment conditions without either the opportunity or time for deliberation."  Pls.' Opp'n at 8.

B.    *Plaintiffs' Claims*

Four cases have been consolidated for all purposes:

> *Lysa Lambert Phillips v. District of Columbia*, Civ.
> Action No. 00-1113
>
> *Cassandra Brown Shields v. District of Columbia*, Civ.
> Action No. 00-1157
>
> *Joseph Morgan v. District of Columbia*, Civ. Action No.
> 00-1162
>
> *Charles Redding v. District of Columbia*, Civ. Action
> No. 00-1225

1.    Plaintiffs' Constitutional Claims

Plaintiffs' constitutional claims were originally asserted against the District of Columbia as well as against defendants Donald Edwards, Frederick C. Cooper, Jr., Thomas Tippett and Damian A. Wilk in their personal capacities.[3]   All plaintiffs

---

[3] As previously stated, plaintiffs dismissed all claims against
Defendants Cooper and Wilk in April 22 and April 30, 2004,
respectively.  Thus, Phillips brings constitutional claims
against Edwards in his personal capacity. *See* Phillips, Shields,

allege constitutional violations pursuant to 42 U.S.C. § 1983.

## 2.   Plaintiffs' Non-constitutional Claims for Intentional Tortious Conduct:

All plaintiffs assert non-constitutional claims for "intentional tortious conduct" pursuant to local and common law and seek compensatory damages.  All plaintiffs bring such claims against the District and against Edwards in his personal capacity.  In addition, Redding brings tort claims against defendant Tippett in his personal and capacity.

## 3.   Procedural history

Plaintiffs Phillips, Shields and Morgan filed an amended complaint on February 25, 2002.  Plaintiff Redding filed an amended complaint on February 26, 2002.  On March 15, 2002, defendants District of Columbia, Edwards and Cooper filed a motion to dismiss plaintiffs' complaint. Defendant Wilk filed a motion to dismiss Redding's complaint on March 25, 2002. Defendant District of Columbia filed a motion to dismiss Redding's complaint on April 1, 2003.

---

Morgan Compl.("Plaintiffs' Compl.") (Counts I and II). Shields brings constitutional claims against Edwards in his personal capacity. *See Id.*(Count VI). Plaintiff Morgan brings constitutional claims against Edwards in his personal capacity. *See Id.* (Count XI). Redding brings constitutional claims against Edwards and Tippett in their personal capacities. *See* Redding Compl. (Count I).

As the motions to dismiss raised common issues, the Court addressed them jointly as a single motion to dismiss and on March 31, 2003, the Court issued an Opinion and Order resolving the motion.  The defendants' motion to dismiss the plaintiffs' § 1983 claims asserted on behalf of the deceased and injured firefighters against the District and individual defendants was denied because this Court found that the plaintiffs had adequately alleged that the District and its employees created a conscience-shocking danger that caused the firefighters' injuries and death and that defendants were deliberately indifferent to the high probability of such tragedy.

Defendant's motion to dismiss plaintiffs' intentional tort claims for compensatory and punitive damages against the individual defendants, sued in their personal capacities, was denied.

## III. Discussion

*A. Standard of Review for Motion to Dismiss*

The Court will not grant a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276

(D.C. Cir. 1994).  Accordingly, when ruling on a motion to
dismiss, the Court accepts as true all of the complaint's factual
allegations.  *See Does v. United States Dep't of Justice*, 753
F.2d 1092, 1102 (D.C. Cir. 1985).  Plaintiff is entitled to "the
benefit of all inferences that can be derived from the facts
alleged."  *Kowal*, 16 F.3d at 1276

B.   *Analysis of the Plaintiffs' Constitutional Claims Against
Individual Defendants in Light of the Recent Court of Appeals
Decisions on Qualified Immunity for Government Officials*

     As previously stated, plaintiffs seek to hold defendant
Edwards, the former District of Columbia Fire Chief, and
defendant Tippett, the Deputy Fire Chief at the time of the
Cherry Road Fire, liable in their personal capacities for
violations of plaintiffs' constitutional rights.  In its March
31, 2003 Memorandum Opinion, this Court stated

          According to plaintiffs, whose statements the Court
          must accept as true for purposes of the present motion,
          the named defendants "either committed, or by virtue of
          the policy of the D.C. Fire Department allowed, or
          established an operational environment that enabled,
          numerous violations of the mandatory Standard Operating
          Procedures to occur at the Cherry Road Fire . . ."
          Pls.' Compl. ¶ 27. Edwards, specifically, was
          "responsible for training, instruction, supervision,
          discipline, control, and conduct of firefighters,
          including the compliance with all policies, customs,
          instructions, and Standard Operating Procedures."
          Compl. ¶ 26. In light of the supervisory and decision-
          making capacities of the named individuals, and the
          ongoing failure to institute corrective training or to
          follow the DCFD's own rules even after the scathing
          reviews contained in a number of safety reports, the
          Court cannot at this juncture find that plaintiffs "can

11

> prove no set of facts" that would support their claims
> for relief. *Conley*, 355 U.S. at 45-46. Because the
> Court must accept all of plaintiffs' allegations as
> true, and because plaintiffs are entitled to all
> reasonable inferences, the Court cannot presently
> dismiss the plaintiffs' § 1983 claims against
> individual defendants.

*See Phillips v. District of Columbia*, 257 F. Supp. 2d 69, 80
(D.D.C. 2003).

Defendants now contend that two cases decided subsequent to
this Court's decision denying defendants' motion to dismiss the
claims against the individual defendants in their personal
capacities necessitate a reversal of this conclusion.

1.   *Int'l Action Center v. United States*

A.   The Court of Appeals Decision

The U.S. Court of Appeals for the District of Columbia
Circuit decided *Int'l Action* on April 16, 2004.  The case was
brought by organizations and individuals challenging law
enforcement activities during the 2001 Inaugural Parade.  365
F.3d at 22.  Among other defendants, the plaintiffs sued the
District of Columbia Metropolitan Police Department (MPD) and six
individual MPD officers.  *Id.*  The plaintiffs claimed that while
lawfully and peacefully participating in activities along the
parade route, two officers struck them and sprayed a chemical
agent into their eyes and faces, without provocation or
justification.  *Id.* at 22.  The plaintiffs brought a claim
pursuant to 42 U.S.C. § 1983 against the supervisors in their

personal capacities, seeking money damages for the injuries allegedly inflicted by the officers, on the grounds that the supervisors failed to properly train and supervise their subordinates, therefore making it likely that tortious conduct would result.  *Id.* at 21-22.  One of plaintiffs' theories for the supervisors' liability was "deliberate indifference, or ... non-feasance."  *Id.* at 22.

The district court denied the supervisors' qualified immunity defense, holding that plaintiffs' complaint "sufficiently alleged that 'it was 'highly likely' given the circumstances at the Navy Memorial . . . that MPD officers would violate citizens' constitutional rights,' triggering an obligation on the supervisors to take steps to prevent those violations."  *Id.* at 22-23 (*quoting* district court's opinion at 9 (*quoting Haynesworth v. Miller*, 820 F.2d 1245, 1261 (D.C. Cir. 1987)).  The decision was reversed on appeal.

In its analysis, the Circuit Court noted that for an official to be personally liable, "that official must have violated a constitutional right, *and* that right must have been 'clearly established' – 'the contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.'" *Id.* at 24 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Circuit Court found that the district court's decision

13

to deny the supervisors' qualified immunity because it was
"highly likely" based on the circumstances at the Navy Memorial
that the MPD officers would violate citizens' constitutional
rights was too general to support the plaintiffs' theory of
liability.  "The district court's analysis failed to link the
likelihood of particular constitutional violations to any past
transgressions, and failed to link these particular supervisors
to those past practices or any familiarity with them."  *Id.* at
27.  The court went on to note

> This court in *Haynesworth* stated that some courts 'have
> also concluded that a duty to supervise may arise, even
> absent a pattern of past transgressions.' ... In such a
> case, however, the duty could only exist 'where
> training has been so clearly deficient that some
> deprivation of rights will *inevitably* result absent
> additional instruction.  Plaintiffs here made no
> allegations that the individual appellants bore any
> responsibility for the general training of [the
> officers] at all, or were in any sense on notice that
> such training had been so deficient that constitutional
> violations would 'inevitably result.'

*Id.* at 27 (citations omitted).  Moreover, the court continued,
"[a] supervisor who merely fails to detect and prevent a
subordinate's misconduct, therefore, cannot be liable for that
misconduct.  'The supervisor must know about the conduct and
facilitate it, approve it, condone it, or turn a blind eye for
fear of what they might see.' *Id.* at 28 (*quoting Jones v. City of
Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (Posner, J.)).

Finally, the Circuit Court held that "absent an allegation
that the MPD supervisors had actual or constructive knowledge of

past transgressions or that the supervisors were responsible for or aware of 'clearly deficient' training, the supervisors did not violate any constitutional right through inaction or failure to supervise." *Id.* at 13.

B.   Application of *Int'l Action* to the instant case

Not surprisingly, the plaintiffs contend the *Int'l Action* case does not change the outcome of this Court's March 31, 2003 decision denying the individual defendants qualified immunity.[4]

Also not surprisingly, defendants contend that *Int'l Action* requires reconsideration of this Court's prior decision. Defendants maintain plaintiffs' complaint cannot meet the requirements of the *Int'l Action* opinion for any of the individual defendants, noting that Defendant Edwards was not at the scene of the fire and there is no evidence that he affirmatively participated or engaged in misconduct giving rise to constitutional violations by his subordinates.  Moreover, defendants argue that because the claims against the individual defendants cannot be maintained under *Int'l Action*, the Section 1983 claims against the District of Columbia - which are derivative from the actions of its officials – should be

---

[4] Plaintiffs do concede, however, that in light of *Int'l Action* they may not be able to establish Defendant Cooper's awareness of or responsibility for deficient training and enforcement of mandatory procedures.  Therefore, plaintiffs voluntarily dismissed Cooper from the case.

dismissed as well.

After careful consideration, this Court concludes that the
decision in the *Int'l Action* case does not warrant dismissal of
the claims against the individual defendants in the present case
based on the defendants' claims of immunity.  It is clear from
the opinion in *Int'l Action* that the generality of the claims in
that case did not meet the requisite test.  Unlike the plaintiffs
in *Int'l Action*, however, plaintiffs in this case are not
alleging that the Fire Chief and Deputy Chief had a general
responsibility to detect and prevent constitutional violations.
Rather, plaintiffs allege that two previous reports put the Fire
Department and the Fire Chief and Deputy Chief on notice of
<u>specific</u> circumstances and problems that, if not addressed, were
<u>almost certain</u> to result in injury or death.  Moreover, at least
one report had focused on a fire two years prior to the one at
issue here that resulted in the death of a firefighter and
specifically focused on training and failure to follow
procedures.  Therefore, accepting all of plaintiff's factual
allegations as true, the *Phillips* plaintiffs may be able to "link
the likelihood of particular constitutional violations to ...
past transgressions, and ... to link these particular supervisors
to those past practices or any familiarity with them." *Int'l
Action*, 365 F.3d at 27.  Thus, plaintiffs' claims against the
individual defendants survive the defendants' motion to dismiss

and the defendants' motion to vacate is denied.


2.   *Fraternal Order of Police v. Williams*

B.   The Court of Appeals Decision

On July 20, 2004, the Court of Appeals for the District of
Columbia Circuit decided *Fraternal Order of Police Department of
Corrections Labor Committee v. Williams*, 375 F.3d 1141 (D.C. Cir.
2004), in which the police union brought a § 1983 suit against
the District of Columbia, the District's Mayor and the Director
of the Department of Corrections ("DOC" or "Director").  The
union claimed that the Mayor and the DOC acted with deliberate
indifference to the safety of correctional officers when they
laid off hundreds of officers and simultaneously increased the
number of inmates housed at the D.C. jail.  *Id.* at 1142.  The
union based its claim on the "state endangerment concept"
recognized in *Butera v. District of Columbia*, 235 F.3d 637, 651
(D.C. Cir. 2001).  *FOP*, 375 F.3d at 1142.  The district court
dismissed the claims against the individual defendants and the
Circuit affirmed, concluding

> The challenged acts of the Mayor and the DOC Director –
> implementing RIFs and relocating prisoners to another
> detention facility in response to congressional
> appropriations and mandates – in no way approach the
> 'cognizable level of executive abuse of power as that
> which shocks the conscience.' [*County of Sacramento v.*]
> *Lewis*, 523 U.S. [833] at 846, 118 S.Ct. [1708] at 1716
> [(1998)].  The conscience-shock inquiry is a 'threshold
> question' 'in a due process challenge to executive
> action.'  *Id.* at 847 n.8, 118 S.Ct. 1716 n.8; *see id.*

at 846, 118 S.Ct. at 1716 ('Only the most egregious
official conduct can be said to be 'arbitrary in the
constitutional sense.' (quoting *Collins [v. City of
Harker Heights]*, 503 U.S. [115] at 129, 112 S.Ct.
[1061] at 1070 (1992))).  It is a 'stringent
requirement' that 'exists to differentiate substantive
due process ... from local tort law, *Butera*, 235 F.3d
at 651; *see Uhlrig v. Harder*, 64 F.3d 567, 572 (10th
Cir. 1995)... and recognizes the 'presumption that the
administration of government programs' and 'decisions
concerning the allocation of resources' are 'based on a
rational decisionmaking process that takes account of
competing social, political, and economic forces.'
*Collins*, 503 U.S. at 128, 112 S.Ct. at 1069.  It is
'conduct intended to injure in some way unjustifiable
by any government interest' – and not such large-scale
personnel and program decisions as relocation of
inmates and reallocation of correctional officers
resulting therefrom, made by officials at the highest
level of the District government in response to
congressional directives and appropriations – that 'is
the sort of official action most likely to rise to the
conscience-shocking level.'  *Lewis*, 523 U.S. at 849,
118 S.Ct. at 1718 (citing *Daniels v. Williams*, 474 U.S.
327, 331, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986)).

*Id.* at 1145.

On appeal, the union argued that its complaint against the

individual defendants met the conscience-shocking test based on

its allegations "that the mayor and the DOC Director 'had the

luxury to make unhurried judgments concerning the ratio of

[c]orrectional officers staffing to inmate population' and

instead acted with 'deliberate indifference' to the safety and

security of the correctional officers."  *Id.*  The Circuit Court,

however, observed that the "lower threshold" of the conscience-

shocking test – deliberate indifference rather than intentional

conduct – applies only in "'circumstances where the State has a

heightened obligation toward the individual.'" *Id.* at 1145-46
(*quoting Butera*, 235 F.3d at 651 and *citing Lewis*, 523 U.S. at
850, 118 S.Ct. at 1718 and *Daniels*, 474 U.S. at 331, 106 S.Ct. at
664).  For example, the court continued, taking a person into
custody is such a special circumstance where an official's
deliberate indifference might be truly shocking.  The court
distinguished that circumstance (a person in custody) from one
the Circuit "previously rejected[,] a prison guard's substantive
due process claim based on the alleged danger resulting from
overcrowding and a shortage of guards."  *Id.* at 1146 (*citing
Washington v. District of Columbia*, 802 F.2d 1478 (D.C. Cir.
1986)).

The Circuit Court's opinion in *FOP* contrasts the situation
where the state takes a person into custody and then shows
deliberate indifference to that person's safety with the
situation where a state employs a person in an inherently-
dangerous occupation, noting that the latter is voluntary.  *Id.*
at 1146.  The opinion discusses this distinction at length, and
notes that in *Collins v. City of Harker Heights*, 503 U.S. 115,
128-29 (1992), the Supreme Court rejected a widow's claim that
the Due Process Clause required a city to "'provide its employees
with certain minimal levels of safety and security' 'when it
made, and [the worker] voluntarily accepted, an offer of
employment.'" *FOP* at 1147 (*citing Collins*, 503 U.S. at 127-28,

19

112 S.Ct. at 1069-70).

Plaintiffs in the instant case contend the *FOP* decision is consistent with this Court's ruling of March 31, 2003. Plaintiffs point to a number of differences between their case and the *FOP* case.  First, in the *FOP* case there were external requirements imposed by Congress that impacted the governmental decisions to cut personnel and add inmates, whereas in *Phillips* those external factors are not at issue.  Second, in *FOP* there were no injured litigants, whereas here there were deaths and injuries to plaintiffs.  Third, the *FOP* decision addressed voluntary employment and known endangerment, whereas the *Phillips* plaintiffs assert the firefighters did not know of the specific dangerous deficiencies in fire department operations and training that led to their injuries.  Also, plaintiffs contend, under D.C. law the firefighters were not free to resign their positions without permission from the Mayor and one month's notice.

Plaintiffs submit that their Fifth Amendment rights to life and personal security or protection from egregious executive action were violated when the Fire Department failed to enact procedures and provide training necessary to make the firefighters' duties as safe as possible in light of the inherent hazards, despite numerous warnings and reports that a failure to do so could result in injury or death.  Plaintiffs argue that ignoring these warnings amounted to a policy of deliberate

20

indifference to firefighter safety.  Finally, plaintiffs maintain the *FOP* case involved external pressures (from Congress) and a balancing of demands for resources and argue that by contrast no government interest can or has been identified in *Phillips* that would justify a custom and policy of deliberate indifference to firefighter safety.

Defendants read the *FOP* decision differently; they argue this Court went too far in making new law when it upheld the *Phillips* plaintiffs' § 1983 claims.  Defendants contend the *FOP* opinion articulates the extremely high threshold that must be overcome in order to meet the conscience-shocking test and note that the Supreme Court has only found it satisfied once (in a case that involved forcible extraction of stomach contents) and that the D.C. Circuit has also found it satisfied once (in a case that involved a prisoner's allegations of "unprovoked, brutal beatings" by correctional officers).  Defendants maintain that nothing in the instant case comes close to satisfying this exacting test.

Defendants also allege that plaintiffs' § 1983 claim is based on "essentially the violation of internal D.C. Fire Department Standard Operating Procedures."  Defendants submit the law of this Circuit is clear that inconsistency with state or even federal law is not sufficient to establish a constitutional violation, that plaintiffs' claim would transform a local-law

claim into a federal claim, and moreover that the SOPs do not even have the status of DC law.

Finally, defendants discuss the *Collins* case at length – which is also discussed in detail in the *FOP* opinion – and note that despite facts very similar to those in *Phillips* (including a claim that the city had violated the decedent employee's constitutional right to life by following a custom and policy of not training employees, not providing safety equipment and safety warnings, failing to take notice after a prior incident that allegedly should have given the city notice of the risks, and violating a state statute), the Supreme Court in *Collins* was "not persuaded that the city's alleged failure to train its employees ... was an omission that can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *Collins*, 503 U.S. at 128.  Defendants conclude

> *Collins*, as elucidated by the Court of Appeals in *FOP*, mandates the conclusion here that, even if a failure to ensure compliance with the Fire Department's SOPs caused plaintiffs' deaths and injuries, no constitutional rights were violated.  'The Due Process Clause' does not 'guarantee municipal employees a workplace that is free of unreasonable risks of harm.' *Collins* is consistent with this Court's holding in *Washington*, and as the Court of Appeals made clear in *FOP*, *Collins* does not undermine or limit the vitality of *Washington*.  *Collins, Washington,* and now *FOP* thus hold that a very large category of employee claims of inadequate supervision, training and the like are not arbitrary in the constitutional sense, even when a policy or practice exposes such employees to the risk of death or serious bodily injury.

Def. Resp. at 7.

After careful consideration of the facts in the present case in the context of the *FOP* decision, this Court concludes that it does not "appear[] beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitled [them] to relief." *Conley*, 355 U.S. at 45-46.  In this Court's view, the distinguishing facts in the instant case compel a different result in the conscience-shocking analysis than do the facts in *FOP*.

An important basis for the court's decision in *FOP* seems to be that the Mayor and DOC Director's decision to reduce the number of corrections officers even while increasing the number of inmates housed at the D.C. Jail was a rational policy choice made amid competing resource demands and in the context of outside pressures - namely closure of the Lorton Correctional Complex, Congressional appropriation cuts, and a surplus of corrections officers following the closure of Lorton.  *Id.* at 1142.

This Court is ever-cognizant of the need for deference to governmental policy decisions - decisions that require a weighing and balancing of numerous, often competing, factors and interests amid inevitable constraints - and the slippery slope that would result if § 1983 actions against government officials were allowed to proceed every time a policy choice negatively impacted an individual or group of individuals.  In this case, however,

plaintiffs' allegations do not amount to a case wherein the Fire
Chief and Deputy Chief simply made a policy decision in light of
budgetary, manpower or other outside pressures that it was not
feasible for the Fire Department to enact mandatory operating
procedures, adequately train firefighters, or heed clear warnings
that continued inaction would almost certainly lead to death or
serious injury.  Rather, plaintiffs allege that the City and
these individual defendants did nothing because they simply did
not care.  If true - and again, at this stage of the proceedings
this Court must assume the allegations as plead - this deliberate
indifference continues to shock this Court's conscience and
nothing in the *FOP* decision persuades this Court that its
previous conclusion is flawed.

Another aspect of the *FOP* decision presents a more difficult
obstacle for plaintiffs in this case: that is the Circuit Court's
suggestion that it will look for a "heightened obligation" toward
the individual if the shock-the-conscience test is to be met by
showing deliberate indifference (as opposed to some affirmative
state action).  *Id.* at 1145-46.  The court indicates that this
heightened obligation may be met when the state takes an
individual into custody, but the court does not provide other
examples of the heightened obligation.  *Id.*  Moreover, the
Circuit Court in *FOP* notes the difference between individuals and
employees and points out that the voluntary nature of employment

mitigates the municipality's constitutional obligations to the employee, especially when the risks involved in the job are known or foreseeable.  *Id.* at 1146 (*citing Washington*, 802 F.2d at 1480-82).

Obviously, the firefighters in this case were not in custody at the time of the District's alleged indifference. Nevertheless, especially in light of plaintiffs' assertion that the firefighters were not free under D.C. law to resign their positions without the mayor's permission and one-month's notice, *see* Pl. Mem. Analysis at 2 (*citing* D.C. Code 5-407(a)), the firefighter's employment comes closer to the heightened obligation standard than would the more common at-will, voluntary employment situation.

Upon reconsideration of this Court's original decision denying defendants' motion to dismiss the plaintiffs' claims against the individual defendants, this Court again concludes that the plaintiffs' claims against the individual defendants in their personal capacities survive the defendants' motion to dismiss.  Defendants' motion to vacate, therefore, is denied.

## IV.  Conclusion

The individual defendants' motion to vacate this Court's order denying their motion to dismiss plaintiffs' claims against the individual defendants in their personal capacities is **DENIED**.

Plaintiffs have adequately alleged that those individuals created a conscience-shocking danger that caused plaintiffs' injuries and death and the individual defendants were deliberately indifferent to the high probability of such tragedy.  The defendants' motion to vacate and to dismiss the derivative claims against the District of Columbia is also **DENIED**.

An appropriate Order accompanies this Memorandum Opinion.